ENTERED
_____ LOGGED _____ RECEIVED

JUN 1 2 2014

IN THE UNITED STATES DISTRICT COURT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
AT BALTIMORE
FOR THE DISTRICT OF MARYLAND

DEPUTY

IN THE MATTER OF THE SEARCH OF: )          CASE NO. 14-mj-1285-SKG
A second SanDisk thumb drive found        )
inside a black Lexus automobile, MD license plate )
# 7AE5297, VIN # JTCHCE1KS9B0029209        )          UNDER SEAL


## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Tammy D. Ray, being duly sworn, states as follows:

### YOUR AFFIANT'S BACKGROUND, TRAINING, & EXPERIENCE

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have

been so employed since January 2010. I received basic training as a Special Agent for the FBI at

the FBI Academy located in Quantico, Virginia, including training in the investigation of white-

collar crime. During the past four years and three months that I have served in federal law

enforcement, I have been involved in investigations of financial crimes, two of which resulted in

arrests. Since joining the FBI, I have participated in the execution of numerous search warrants.

Prior to joining the FBI, I spent 11½ years in the energy industry and held various positions that

included auditing, financial analysis, and accounting. I am currently assigned to the FBI's

Baltimore Division, working out of the Rockville Resident Agency.

### ITEMS SOUGHT TO BE SEARCHED

2.      This supplemental Affidavit is submitted in support of an application for a

warrant to search a second SanDisk thumb drive that was found during the execution of a

previous search warrant relating to a black 2011 LEXUS, Maryland license plate 7AE5297, VIN

number JTHCE1KS9B0029209. That car was leased by Curtis R. Martin, Jr. and was seized by

law enforcement agents following Martin's arrest on Tuesday, December 3, 2013 on charges of

committing numerous violations of his conditions of supervised release. This Court (Magistrate Judge Susan Gauvey) previously authorized a search warrant for that vehicle on December 20, 2013, and that search was executed on December 26, 2013.

3.     The information contained in this Affidavit and in the previous Affidavit submitted in connection with the original request for a search of the subject vehicle (attached as **Exhibit 1**) is based on my personal knowledge; information made available to me by other law enforcement officers and United States Probation Officer (USPO) William Tavik; as well as information provided by various witnesses whom I have interviewed. Because this supplemental Affidavit is being submitted for the limited purpose of securing a search warrant with regard only to the second SanDisk thumb drive that was discovered during the search of the subject vehicle, I have included only those facts that I believe are sufficient to establish probable cause to believe that Curtis R. Martin, Jr. ("Martin") has committed violations of 18 U.S.C. §§ 371, 1341, 1343, 1344, 1349, and 1956, and that evidence, fruits, and instrumentalities of those violations will be found within the thumb drive discussed above.

## BACKGROUND INFORMATION RELATING TO CURTIS R. MARTIN, JR.

4.     Please refer to the original affidavit, which is attached to this document, for background information relating to Martin.

## INFORMATION RELATING TO MARTIN AND OLEDIX TECHNOLOGIES RECEIVED FROM MS. DEBORAH K. LEAR OR OTHERWISE

5.     Please refer to the original affidavit, which is attached to this document, for information relating to Martin and Oledix Technologies.

## MARTIN'S RECENT ACTIVITIES INVOLVING
## EMRX HEALTHCARE TECHNOLOGIES

6.      Please refer to the original affidavit, which is attached to this document, for

information relating to Martin's recent activities involving EMRx Healthcare Technologies.

## MARTIN'S FALSE STATEMENTS AND MATERIAL NON-DISCLOSURES TO THE
## UNITED STATES PROBATION OFFICE AND OTHER VIOLATIONS OF HIS
## CONDITIONS OF SUPERVISED RELEASE

7.      Please refer to the original affidavit, which is attached to this document, for

information relating to Martin's false statements and material non-disclosures to the USPO and

other violations of his conditions of supervised release.

## MARTIN'S ARREST AND THE SUBSEQUENT INVENTORY SEARCH
## OF HIS LEASED LEXUS

8.      Please refer to the original affidavit, which is attached to this document, for

information relating to Martin's arrest and the subsequent inventory search of his leased Lexus.

## SEARCH WARRANT EXECUTED ON MARTIN'S LEASED LEXUS

9.      A search and seizure warrant for Martin's Lexus was signed by U.S. Magistrate

Judge Susan K. Gauvey on December 20, 2013, and was executed by the affiant and other agents

on December 26, 2013.  During the course of that search, the searching agents found business

cards carrying Mr. Martin's name for a previous unknown business called EMRX Capital

Partners, as well as cards of various businesses he was apparently dealing with; an address

book/planner with business contacts; a small spiral-bound notebook with names (both

individuals and businesses, including financing companies), notations, financial calculations

(some involving hundreds of thousands and even millions of dollars), references to Oledix,

notations relating to various business expenses, including office leases, etc.; pay-related records

for an Oledix employee; unopened mail items addressed to Martin at Oledix Technologies and/or

to Oledix Technologies directly; bills and emails directed to Martin and/or Oledix Technologies;

documents relating to applications seeking business financing; copies of a 2012 tax return for

Martin and tax-related documents for Oledix Technologies, the Oledix Store, and EMRX

Healthcare Technologies; copies of complaints and other legal documents from lawsuits against

Martin and/or Oledix Technologies; incorporation documents, an employment contract, and

other records relating to EMRX Healthcare Technologies; and documents relating to supposed

employment of Martin by a company called NetCare Data Management Corporation.  **Exhibit 2**

(search warrant inventory).

      10.     During the search, the agents also recovered the following electronic items:  an

IPhone manufactured by Apple, which has been downloaded, but which proved to contain

minimal text and contents; and an Apple IPad and a Hanvon tablet computer.  The Hanvon tablet

computer has not yet been downloaded, but it is not password protected and after quickly

scanning through the tablet, it appears to contain minimal text and contents.  The Apple IPAD is

locked and password protected.  The FBI's Computer Analysis Response Team (CART) is

consulting with experts at the FBI's Quantico facility in order to determine how to best access its

contents.  If this collaboration is unsuccessful, we will ask Apple to undertake to unlock the

IPAD.  We also recovered a Samsung cellular phone from Martin's person at the time of his

arrest.  We have unlocked and downloaded the contents of this phone, which totaled

approximately 17 gigabytes, but your Affiant has not yet had an opportunity to review this

material in detail.

11.     During the search of the subject Lexus 2011 automobile identified above, in addition to the items identified during the inventory procedure and outlined in the original search warrant, a second SanDisk thumb drive was recovered. (The agents have held off on searching either Sandisk thumb drive until authorization is obtained to search both, because a specific description of the first SanDisk thumb drive was not noted during the original inventory procedure that was conducted back in December, so the agents could not be certain which of the two thumb drives was found during the initial inventory procedure, and which additional drive was subsequently found during the execution of the search warrant.) Based upon my training and experience in investigating white collar crime, the second thumb drive likely contains information or documents pertaining to Martin's companies, activities, and other involved parties.

12.     Commencing on January 15, 2014 and concluding on March 18, 2014, U.S. District Court Judge Richard D. Bennett conducted a hearing upon the allegations contained in a petition charging Martin with multiple violations of his conditions of supervised release. During that hearing, the government presented evidence relating to the information set forth in the prior search warrant affidavit that was submitted to this Court in December 2013. On March 18, Judge Bennett found, by a preponderance of the evidence, that Martin was guilty of all nine violations that were alleged in the petition filed by U.S. Probation Officer William Tavik. Judge Bennett revoked Martin's supervised release and sentenced him to serve a term of 18 months imprisonment. **Exhibit 3** (Judgment Order on Petition for Violation of Supervised Release dated March 18, 2014).

## SUMMARY OF PROBABLE CAUSE

13.     Based upon the evidence set forth in the original affidavit, there is probable cause
to believe that Martin has committed mail and/or wire and bank fraud by submitting false credit
applications to Lexus Financial Services; to American Express; to Bank of America; and to the
other companies from which he obtained the credit cards that were identified in his car during the
inventory search. The evidence (in the form of bank account records, witness interviews,
allegations in lawsuits and items found during the search of the Lexus) indicates that neither
Oledix nor EMRx were legitimate businesses with income resulting from *bona fide* commercial
transactions, as opposed to funds received as a result of fraudulent representations and the
incurring of hundreds of thousands of dollars in unpaid charges on company credit cards. Martin
misrepresented his business activities to all of the U.S. probation officers who supervised his
case and never identified any legitimate employment that has subsequently been verified for the
entire period of more than three years since he started work release while still residing at VOA.

14.     Based on my training and experience in investigating white collar crime,
individuals who own or operate small and/or newly established businesses utilize and rely
heavily on computers and electronic media, such as smart phones, tablets and thumb drives, to
exchange e-mails, advertise their companies on-line, access social media sites, create and store
business-related documents and financials, and communicate with employees, vendors, and
potential or established clients. Shortly after his release from incarceration, Martin started a
business, Oledix Technologies, which allegedly sold computers. Martin operated Oledix
Technologies until at least the summer of 2012, maintained bank accounts in the Oledix name
through at least November 2013, and also incorporated a number of other businesses using
variations of the name NetCare since his release from VOA. More recently, after Oledix's

cessation of operations in the summer of 2012, Martin established a new company called EMRx; arranged to have a website developed for it; and placed a purported business profile on two websites geared towards soliciting investors, indicating that EMRx was interested in raising millions of dollars in capital. The website and the funding notice both falsely suggested that EMRx was a successful going concern. EMRx's bank account received $171,265.50 from incoming wire transfers between June 2013 and November 2013, the reason for which is not yet clear, but these funds do not appear to have come from legitimate commercial sales transactions. Teresa Fuller, M.D., who was recruited by Martin as a part-time consultant and to be what he called the "base of the company" and the Chief Executive Officer of EMRx, stated that nothing was actually sold during the period that Fuller worked for EMRx from July 2013 through early November 2013. Fuller also stated that Martin told Fuller when they looked at the product it was so unsatisfactory that it was tabled. Fuller resigned from EMRx on November 8, 2013, because EMRx was "financially disorganized".

15.     It further appears that since the summer of 2012, Martin did not rent permanent office space for his the companies he created, but has instead used the services in both Baltimore and Washington of companies that provide short-term rentals of office space for any business meetings he has needed to have. It also appears that EMRx had few, if any, full-time employees during the period after the company was created.

16.     Based upon on my training and experience and the information developed over the course of this investigation to date, including the items already recovered from the subject Black 2011 Lexus during the search in late December 2013, and given his apparent lack of an established, exclusively-used office space during the latter portion of the time when he was on supervised release from the summer of 2012 through early December 2013and his short-term

renting of office space on an as-needed basis from companies where it does not appear that Martin was able to permanently maintain files or records, there is reasonable cause to believe that Martin conducted the continued affairs of the various businesses he had established by using a laptop and/or tablet computer or computers, along with digital storage devices such as thumb drives. The identification of the items specified above and in the original affidavit, and during the inventory that was taken of the contents of Martin's Lexus following his arrest and subsequent search (**Exhibit 2**), suggests that Martin kept computers, digital storage devices like thumb drives, and business-related papers in his vehicle so that they would be readily available to him in the conduct of his various businesses.

17.     Based on my training and experience and the information developed in the course of the investigation of Martin's activities to date, there is probable cause to believe that Martin made use of portable computers, such as laptops or tablets, as well as thumb drives, to store documents and communications relating to his ongoing business enterprises and fraudulent schemes. As a result of the searches conducted of the black 2011 Lexus to date, the investigators have determined that Martin carried or transported his laptops or tablets and digital storage devices such as thumb drives with him when he traveled to the various short-term rental business spaces he utilized or when going to meet with clients or potential investors at other locations.

18.     The items noted during the course of conducting the inventory of the contents of Martin's vehicle and subsequent search provide additional support for the belief that Martin was employing notebook, laptop or tablet computers in conducting his various schemes, including Oledix and EMRx and the various NetCare companies. Accordingly, based on my training and experience and the results of the investigation to date, there is probable cause to believe that the additional SanDisk thumb drive recovered during the most recent search of the subject Lexus

8

2011 automobile, likely contains information about Martin's various companies; his recent and past business and investment solicitation activities, and other individuals who are involved with him, whether as confederates, associates, actual or potential investors, or customers.

## SEARCHING AND SEIZING COMPUTERS

19.     Searches and seizures of evidence from computers and digital storage devices like thumb drives commonly require agents to download or copy information from the computers and their components, or seize most or all computer items (computer hardware, computer software, and computer related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment.  This is almost always true because of the following:

a.      Computer storage devices (like internal or external hard disk drives, compact discs (CD), digital video discs (DVD), flash drives, and others) can store the equivalent of millions of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it in random order with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

b.      Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a computer system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to

tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

20.     In searching any digital storage media, we will, to the extent possible, use computers and forensic software to conduct the searches.  The search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include the following techniques (the following is a non-exclusive list, as other search procedures may be used):

    a.  examination of all of the data contained in such computer hardware, computer software, and/or memory storage devices to view the data and determine whether that data falls within the items to be seized as set forth herein;

    b.  searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

    c.  physical examination of the storage device, including surveying various file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth in Attachment B;

    d.  opening or reading portions of files in order to determine whether their contents fall within the items to be seized as set forth in Attachment B;

e.  scanning storage areas to discover data falling within the list of items to be seized as set forth herein, to possibly recover any such deleted data, and to search for and recover files falling within the list of items to be seized;

f.  performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in Attachment B; and/or

g.  performing any other data analysis technique that may be necessary to locate and retrieve the evidence described in the relevant Attachments.

## CONCLUSION

Based upon the foregoing facts and my training and experience, your Affiant respectfully submits that there is probable cause to believe that the items listed in Attachment B will be found within the second thumb drive belonging to Martin, which was found inside the black 2011 Lexus that was leased and driven by Martin prior to his arrest in December 2013 during the execution of the original search warrant, and which will constitute evidence of criminal activity, specifically mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), bank fraud (18 U.S.C. § 1344), money laundering (18 U.S.C. § 1956), and related offenses.

Tammy D. Ray
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this 29 day of May 2014.

The Honorable Susan K. Gauvey
United States Magistrate Judge

11

1

AO 93 (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

District of Maryland

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )   Case No.   **13-3027 SKG** |
| a black 2011 Lexus, MD license plate # 7AE5297, VIN # | ) |
| JTHCE1KS9B0029209 and items found therein, and a | ) |
| cell phone seized from Martin's person by the USMS | ) |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search
of the following person or property located in the _____ District of _____ Maryland _____
*(identify the person or describe the property to be searched and give its location)*:

Refer to Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property
described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

Refer to Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before _____1/3/14_____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the
person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the
property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory
as required by law and promptly return this warrant and inventory to _____The Hon. Susan K. Gauvey_____ .
                                                                                                  *(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C.
§ 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose
property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____

Date and time issued: _____12/20/13_____
                                        at 3:40 p.m.

                                                                  *Judge's signature*

City and state:      Baltimore, MD _____          The Hon. Susan K. Gauvey, U.S. Magistrate Judge
                                                                                  *Printed name and title*

— Exhibit 1

**ATTACHMENT A**         1 3 - 3 0 2 7 ☐☐☐

## DESCRIPTION OF PROPERTY TO BE SEARCHED

1. A black 2011 LEXUS, Maryland license plate 7AE5297, VIN number

JTHCE1KS9B0029209, and all papers, documents, correspondence, credit cards, or other items

that may be found therein.

2. Two computer(s) and/or tablets that were identified during an inventory previously conducted

of the contents of the above-referenced vehicle, specifically, a black tablet with no obvious

markings and what appears to be a Hanvon tablet computer.

3. A SanDisk thumb drive that was identified during the inventory of the above-referenced

vehicle,

4. A black smart phone that was identified during the inventory, and a second smart phone that

was taken from Martin by USMS at the time of arrest.


Note:  Since the inventory of Martin's vehicle was carried out for general inventory
purposes, serial numbers for the computers or tablets and smart phones were not obtained.  For
many smart phones and tablets, the serial numbers are located on the interior portion of the
device.

13-3027 SKG

## ATTACHMENT B

### ITEMS TO BE SEARCHED FOR AND SEIZED

1.      Financial records, including but not limited to: checking account records, check registers, savings account records, loan records, safe deposit box keys and records, canceled checks, bank receipts, bank checks, money order receipts, credit and debit memos, records relating to certificates of deposit and money market certificates, records relating to U.S. Treasury Notes and Bills, credit card records, records relating to the purchases of bank checks, records relating to wire transfers, travel records and documents, and records relating to purchases, sales and holdings of securities and other investments.

2.      Correspondence, letters, memoranda, applications, contracts, and other documents which contain communications or information exchanged with or created by: (a) Martin and/or the employees or former employees of the companies he created or was affiliated with, including but not limited to Oledix Technologies, the various companies Martin incorporated that included the name NetCare, and EMRx; and (b) other companies or individuals whom Martin worked with or for; (c) investors or potential investors in the companies Martin created or was affiliated with; and (d) actual or potential customers, clients, vendors, lenders, and financing sources who had contact with Martin, the companies he created or was affiliated with, and/or other employees or individuals associated with those companies.

3.      Correspondence, letters, memoranda, applications, powers of attorney, and other documents which contain financial or company information, such as income, expenses, assets, and liabilities.

4.      Records of income from any source, including cash or wire receipts and names of investors.

The above paragraphs 1 through 4 inclusive include all of the foregoing items of evidence in whatever form and by whatever means such materials, their drafts, or their modifications may have been created or stored on the computer(s)/tablet(s), including but not limited to, any handmade form (such as writing); any photocopies; any mechanical form (such as printing, or typing); any electrical, electronic, or magnetic form or data (such as any information on an electronic or magnetic storage device, such as floppy diskettes, hard disks, CD-ROMs, or printer buffers, as well as printouts or readouts from any magnetic storage device).

6.      In addition, computer hardware, software, documentation, passwords, data security devices, and data, as further described below and in the affidavit incorporated by reference into this search warrant, are also to be seized and searched off-site in the manner which is also described below and in the affidavit supporting this search warrant. "Mirroring," "imaging," and/or replication are also authorized.

7.      The items to be seized include any and all electronic devices that are capable of analyzing, creating, displaying, transmitting or storing electronic or magnetic computer impulses or data. These devices include computers, cell phones, telephones, electronic organizers, personal digital assistants (PDAs), fax machines, computer components, computer peripherals, word processing equipment, modems, monitors, printers, plotters, encryption circuit boards, optical scanners, external hard drives, thumb drives, and other computer-related electronic devices.

8.      The items to be seized include any and all instructions or programs stored in the form of electronic or magnetic media that are capable of being interpreted by a computer or related components. The items to be seized include operating systems, application software, utility programs, compilers, interpreters, and other programs or software used to communicate

with computer hardware or peripherals either directly or indirectly via telephone lines, radio, or other means of transmission.

9.     The items to be seized include any and all written or printed material that provides instructions or examples concerning the operation of a computer system, computer software and/or any related device.

The offenses under investigation include mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), bank fraud (18 U.S.C. § 1344), money laundering (18 U.S.C. § 1956), and related offenses.



# UNITED STATES DISTRICT COURT

for the

District of Maryland

| In the Matter of the Search of | |
|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) ) ) ) ) |
| a black 2011 Lexus, MD license plate # 7AE5297, VIN # JTHCE1KS9B0029209 and items found therein, and a cell phone seized from Martin's person by the USMS | |

Case No.

## 13-3027 SKG

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Refer to Attachment A.

located in the _____ District of _____ Maryland _____ , there is now concealed *(identify the person or describe the property to be seized)*:

Refer to Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 1341, 1343, 1344, & 1956 | Mail Fraud; Wire Fraud; Bank Fraud, and Money Laundering |

The application is based on these facts:

Please refer to the attached Affidavit.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

FBI Special Agent Tammy D. Ray
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __12/20/13__

_____
*Judge's signature*

City and state:  Baltimore, MD

The Hon. Susan K. Gauvey, U.S. Magistrate Judge
*Printed name and title*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: ) | CASE NO. 13-3027 SKG |
| A black Lexus automobile, MD license plate ) | |
| # 7AE5297,  VIN # JTCHCE1KS9B0029209, ) | **UNDER SEAL** |
| along with two laptop or tablet computers, a ) | |
| SanDisk thumb drive and a cell phone found ) | |
| therein, and a cell phone seized from the person of ) | |
| Curtis R. Martin by the United States Marshal's ) | |
| Service ) | |

### AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Tammy D. Ray, being duly sworn, states as follows:

### YOUR AFFIANT'S BACKGROUND, TRAINING, & EXPERIENCE

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have

been so employed since January 2010.  I received basic training as a Special Agent for the FBI at

the FBI Academy located in Quantico, Virginia, including training in the investigation of white-

collar crime.  During the past three years and eleven months that I have served in federal law

enforcement, I have been involved in investigations of financial crimes, two of which resulted in

arrests.  Since joining the FBI, I have participated in the execution of numerous search warrants.

Prior to joining the FBI, I spent 11½ years in the energy industry and held various positions that

included auditing, financial analysis, and accounting.  I am currently assigned to the FBI's

Baltimore Division, working out of the Rockville Resident Agency.

### ITEMS SOUGHT TO BE SEARCHED

2.      This affidavit is submitted in support of an application for a warrant to search a

black 2011 LEXUS, Maryland license plate 7AE5297, VIN number JTHCE1KS9B0029209,

leased by Curtis R. Martin, Jr., which was recently seized by law enforcement agents following

Martin's arrest on Tuesday, December 3, 2013 on charges of committing numerous violations of

his conditions of supervised release.  This application also requests authorization to search two laptop or tablet computers -- a black tablet or electronic notebook with no obvious markings and a Hanvon tablet or electronic notebook -- that were observed during an inventory of the contents of Martin's vehicle conducted by your Affiant and another agent following its seizure, as well as a SanDisk thumb drive and a black smart phone that was likewise located inside Martin's car during the course of the inventory procedure.  Finally, this application seeks authorization to search an additional cell phone that was taken from Martin's person at the time of his arrest by the officers of the United States Marshals Service (USMS).

3.     The information contained in this Affidavit is based on my personal knowledge; information made available to me by other law enforcement officers and United States Probation Officer (USPO) William Tavik; as well as information provided by various witnesses whom I have interviewed.  Because this Affidavit is being submitted for the limited purpose of securing a search warrant, I have included only those facts that I believe are sufficient to establish probable cause to believe that Curtis R. Martin, Jr. ("Martin") has committed violations of 18 U.S.C. §§ 1341, 1343, 1344, and 1956, and that evidence, fruits, and instrumentalities of those violations will be found within Martin's black 2011 Lexus automobile, as well as within two laptop and/or tablet computer(s), the thumb drive, and the two cellular telephones discussed above.

## BACKGROUND INFORMATION RELATING
## TO CURTIS R. MARTIN, JR.

4.     Based upon a review of the Pre-Sentence Report (PSR) prepared in connection with a previous federal criminal case in the late 1990's in which Martin was a defendant, your Affiant has learned that Martin – who is 54 years old – has a record of fraud-related criminal convictions dating back to 1980.  Martin was first convicted on two charges of credit card fraud

2

in Texas in 1980. In 1984, Martin was convicted of forgery charges after he stole checks from his then-employer and then cashed them. Subsequently, in 1986, Martin was convicted of bail bond violations arising out of underlying acts that involved passing bad checks and obtaining a credit card by fraudulent means. Although those convictions were later vacated by the Colorado Supreme Court, the PSR from his prior federal case noted that "The facts in the underlying Colorado case appear clear the defendant was involved in a fraudulent matter." In the early 1990's, Martin was convicted on charges of grand theft arising out of a fraud scheme whereby he obtained a large amount of computer equipment on credit by using false documentation and then sold it. In 1995, he was again convicted of charges of grand theft arising out of a scheme he carried out while living as a parolee in a halfway house, in which he defrauded a gas station owner who was having financial difficulties of $125,000. All of these cases were prosecuted by state authorities, whether in Texas, Colorado, or in California.

5.     In the late 1990's, Martin was the subject of an investigation by the FBI in California which ultimately resulted in his pleading guilty to four federal fraud charges. The Statement of Facts submitted to the United States District Court for the Eastern District of California in connection with that case indicates that Martin, working with a co-conspirator whom he had met in a halfway house following his most recent state criminal conviction, carried out a fraud scheme in which he falsely represented himself to be affiliated with an actual company named CCM Capital, which was an established subsidiary of a large international Hong Kong-based corporation. Martin exploited his supposed connection with the real CCM Capital to obtain millions of dollars of credit which he used to lease computer equipment. Martin then sold the equipment and used the proceeds both to support his life-style and to further the continuation of the scheme, which resulted in losses to three different victims of at least $4.5

3

exercise of this authority by the Probation Office here.) It appears that Martin was incarcerated on these charges from the time of his original arrest in March 1999 until he was released to VOA in 2010.

7. Martin completed the incarceration portion of his sentence and was released to the Volunteers of America (VOA) halfway house in Baltimore, Maryland on July 27, 2010. (Martin had requested that his supervision be transferred to this District because he had family in this area). Martin was released from VOA on December 23, 2010. His three-year term of supervised release was scheduled to expire on December 22, 2013.

## INFORMATION RELATING TO MARTIN AND OLEDIX TECHNOLOGIES RECEIVED FROM MS. DEBORAH K. LEAR OR OTHERWISE

8. In January 2013, your affiant met with Ms. Deborah K. Lear, a resident of North Potomac, Maryland, and two attorneys representing Ms. Lear. Ms. Lear, who is single, advised your affiant that she had met Martin through an on-line dating website in or about September 2010. At the time, Ms. Lear, who was in her mid-50's, held the position of Director, Office of Housing Assistance Contract Administration Oversight, at the United States Department of Housing & Urban Development (HUD). Ms. Lear was getting close to retiring. She was already receiving a $5,000 monthly payment from an annuity and had paid off all but about $50,000 on the mortgage on her home, which she valued at $800,000 - $900,000.

9. At the time she and Martin began dating, Ms. Lear understood that Martin operated a retail computer business called Oledix. Lear was not aware of Martin's prior criminal activities and believed the business to be legitimate. She further understood that Martin at that time was living with his brother in Frederick, Maryland. In fact, during the fall of 2010, Martin was residing at VOA.

5

10.     Shortly after Martin was released from VOA in December 2010, he moved in with Ms. Lear and lived with her until November 2012. Even before he moved in with her, in November 2010, Martin asked Lear to invest in his company. Martin told Lear he was building out a business office for Oledix, and there was going to be a separate Oledix Store on the first floor of the same office building where people could come and view its products. Lear advised your Affiant that she gave Martin $20,000 in November 2010 and another $10,000 the following month to help meet Oledix's expenses. In December 2010, Lear also took out a home equity line of credit in the amount of $249,000 and began providing money from that source to Martin for Oledix.

11.     That same month, Martin also applied for business credit cards in the name of Oledix from both American Express and Bank of America. Martin applied for the credit cards on-line, utilizing Lear's personal information, but acted without Lear's knowledge or consent. Martin made himself an authorized user on the cards.

12.     Your Affiant has obtained and reviewed bank records in the name of Oledix Technologies and the Oledix store from PNC Bank, and in the name of Oledix Technologies from BB&T Bank. These reflect activity from as early as October 2010 through at least August 2013. In January 2013, your Affiant also reviewed screen shots provided by Ms. Lear that she had taken from a website established for Oledix on January 12, 2013, which represented that the company was in the business of "bringing the latest touchscreen technology to the business sector." The website further stated that "Here at OLEDIX Technologies, LLC, we design, manufacture and market a variety of touchscreen products, including the following: Computer monitors, Tablets, Kiosks" and went on to state that "Oledix continues to research and develop emerging touchscreen products. Our online stores offers worldwide customers access to a wealth

of information and unique products . . . ." However, a review of the checking account records for Oledix Technologies does not support the claim that the company was designing and manufacturing the items indicated. And a subsequent lawsuit filed against Martin and Oledix by New Century Financial (discussed in more detail in ¶ 22 below) indicates that in at least some instances, Martin was buying computer equipment from China and then relying upon another contractor in this area to modify it to meet the advertised characteristics of Oledix's products. It should also be noted that two of Martin's prior criminal fraud offenses in California involved either leasing computer equipment or obtaining it on credit and then selling it.

13.  In June 2011, Martin suggested that he and Lear lease two cars from a Lexus dealership. Martin did a business lease on his vehicle, which he filled out in the name of Oledix Technologies. Lear stated the information Martin put on the lease application is false. Martin could not qualify for the lease on his own, so Martin asked Lear to co-sign for him, which she did. Lear did a personal lease on her vehicle. Lear paid and is still paying the car insurance on both vehicles. Martin's request to lease a Lexus was approved, and he was driving this vehicle at the time of his arrest on December 3, 2013.

14.  Your Affiant has reviewed the business credit application submitted by Martin in connection with his lease of this vehicle. It shows that he represented that Oledix had gross revenues of $648,000 in 2010; profits of $319,000; and a tangible net worth the previous year of $988,500. Maryland state records demonstrate that Oledix was only incorporated in late September 2010, while Martin was residing at VOA, so it appears that the company would at most have been operational for a little more than three months during the 2010 calendar year.

15.  As part of this transaction, Martin and Ms. Lear also submitted a joint credit application to Lexus Financial Services (LFS) by means of a facsimile from the Oledix

Technologies offices. (The Northeastern Regional Offices for LFS were then, and are currently, located in Carol Stream, Illinois; it is unclear whether the fax went directly to that location or went initially to a local Lexus dealership, but even in the latter case, at some point the papers would have been transmitted to the Northeastern Regional Office.) On his portion of the application, Martin falsely stated that he had worked for Oledix for a year as of early June 2011, and that he was previously employed by "Net Care Data Management Corp." for 12 years and one month. In fact, Martin was incarcerated on his prior federal convictions for virtually that entire period. Martin also stated on the credit application that he was earning $10,455 monthly from Oledix. However, your Affiant has also interviewed Brianna Clark, who was employed in the position of General Counsel at Oledix from May 2011 until September 2011, when she was terminated. (According to Clark, this occurred after she refused to give in to sexual advances by Martin and had also had disagreements with him about various things he was doing. Clark subsequently filed a lawsuit against Martin charging him with sexual harassment.) Clark stated that Oledix made "not a penny" during the time she worked there, which overlapped the period in which Martin arranged to lease the Lexus.

16.    In November 2011, Lear took out an additional home equity line of credit in the amount of $200,000. Lear drew out this entire sum and gave it all to Martin by check and by wire transfer to help support the operations of Oledix. Thus, in all, Lear provided Martin with approximately $479,000. Lear understood that the Oledix Store opening was in December 2011, but Martin did not invite Lear to the opening. Your Affiant has seen information on-line from a company called Merritt Construction Services indicating that it handled a project to build the Oledix Retail Store at 729 East Pratt Street at a cost of $125,000.00, and that this project was completed in November 2011.

8

17.    Based upon this information, your Affiant investigated the circumstances of Oledix's tenure at 729 East Pratt Street, where (based upon the bank account records) the company maintained offices on the 9th floor from approximately September 2011 through June 2012 and also for some time operated the Oledix "store" on the 1st floor. Your Affiant learned that a company called Merritt owns the building at 729 East Pratt. Merritt has both a leasing and a construction arm. Your Affiant interviewed Pat Franklin of Merritt's Leasing Department with respect to the company's experience both leasing office space to Martin on the 9th floor and the construction project on the 1st floor of 729 East Pratt. Mr. Franklin said of Oledix Technologies that it "posed" as a technology company. Mr. Franklin advised that Martin essentially wound up using the first floor space as a nightclub where he conducted events. He initially stated that Martin never paid Merritt a thing for either the leased space or the construction, but then amended that to say there may have been some early payments from Martin, but that they did not amount to much. Instead, Martin kept giving excuses and pushing off the payments. Merritt ultimately evicted Martin from both spaces in the building. He said that Merritt filed a money judgment against Martin in court in Baltimore City. Franklin further stated that Martin sold some bogus products to tenants in the building, but then never delivered the products. Martin also stated that every word out of Martin's mouth was a lie.

18.    Lear understood that the Oledix Store closed around July 2012 and the Oledix office moved to another location. Oledix's bank records from PNC Bank indicate that after June 2012, the address on the company and Oledix store accounts was changed from 729 E. Pratt Street to 111 S. Calvert Street, Floor 27, in Baltimore, and that this address remained on two of the accounts until August 2013. Oledix's bank records also reveal that in July 2013, there was a payment to Businesssuites, which provides full-service and virtual offices for rent on an as-

needed basis. Businesssuites has office space available for use by its clients at 111 S. Calvert Street, Suite 2700, Baltimore, MD 21202, which matches the address on the Oledix bank statement at that time. Thus, it appears that Oledix no longer maintained an office space for its exclusive use after June 2012.

19. In November 2012, Martin moved out of Lear's house. Martin quit paying on the Bank of America and American Express cards sometime in 2012. Lear subsequently learned there was a balance of approximately $274,000 on the American Express card and approximately $14,000 on the Bank of America card when American Express and Bank of America came after Lear for payment. Lear did not utilize either of those credit cards and did not know she was the primary user listed on the accounts. Just before Martin moved out, Lear saw Martin shredding a large quantity of documents amounting to two full garbage bags. When Lear inquired about this, Martin said it was time to shred.

20. Lear stated that during the time Martin was living with her, Martin had a large desktop computer and a laptop. Martin worked on the desktop computer all the time. He removed it around the time that he moved out in November 2012, and commented that he might sell the desktop computer. Lear did not know what Martin did with his laptop computer.

21. Lear stated that just before Martin moved out in November 2012, Martin told her that he was in trouble as a result of an accounts receivable financing fraud scheme that victimized a company called New Century Financial (NCF) in Houston, Texas. Martin told Lear that he had paid off one or more underwriters with a payment or payments of $4,500 to get them to agree not to conduct background checks on Oledix, and he further represented that he subsequently obtained $275,000 in accounts receivable financing from NCF. Martin indicated that he had submitted fake invoices in order to support receiving additional amounts of financing

from NCF, and that the invoices listed telephone numbers that were actually under Martin's control so that he would be able to "verify" the invoices. Martin indicated that a Mr. Dilip Dalvi of Practical Technologies, Inc. (PTI) was also involved in this matter. Martin stated to Lear that obtaining this financing was a violation of his probation.

22.     Your Affiant has determined that on February 24, 2013, Martin, Oledix, the Oledix Store, PTI and Dilip Dalvi were named in a civil lawsuit filed on behalf of NCF seeking damages of approximately $240,000. This lawsuit alleged that the defendants had conspired to commit fraud by creating false or fraudulent invoices for goods or services that were allegedly performed or delivered to PTI and others by Oledix. NCF's complaint represented that it had entered into an agreement with Oledix and the Oledix Store to purchase certain of Oledix's accounts receivables at a discount. For example, the complaint alleged that NCF purchased an invoice from Oledix with an outstanding balance of $159,000 that was supposedly owed to Oledix by PTI, but that in fact was fraudulent. The complaint further alleged that all contacts between Martin and Oledix and NCF, which was located in Texas, were by e-mail and telephone. The allegations of NCF's lawsuit are consistent with much of what Martin told Lear just before he moved out of Lear's home in late 2012.

23.     Ms. Lear never received back any of the $479,000 she provided to Martin to help finance the operations of Oledix Technologies and the construction of the Oledix store. With regard to the $274,000 in unpaid charges that Martin ran up on the Oledix American Express card account and the additional $14,000 he ran up on the Bank of America account, Amex and Bank of America have agreed that they will take the combined $288,000 loss caused by Martin on these credit cards.

11

## MARTIN'S RECENT ACTIVITIES INVOLVING
## EMRX HEALTHCARE TECHNOLOGIES

24.     On April 26, 2013, Martin incorporated EMRx Healthcare Technologies

Corporation ("EMRx") in Washington, District of Columbia.  EMRx's principal place of

business was identified on the incorporation papers as 1717 K Street, 9th floor, Washington, DC

20036, and that address is also reflected on the company's website (www.EMRx.org).  In August

2013, your Affiant went to the 9th floor of 1717 K Street, Washington, DC.  The 9th floor

contains Carr Workplaces (Carr).  Carr rents office space by the hour, day, week, month, and as

needed, and also provides Virtual Office services, such as mail handling and telephone

answering.

25.     Martin established bank accounts in the name of EMRx at PNC Bank on May 14,

2013.  Your Affiant obtained copies of the records through late August 2013 by means of a grand

jury subpoena.  EMRx's bank records reflect that Martin made payments to Carr in June 2013

and August 2013.  In addition, between June 2013 and August 2013, EMRx received deposits by

means of wire transactions totaling approximately $136,542.00; we have not yet received the

transaction details that would establish the source of these funds.  Oledix's bank records reflect

that in May 2013, a payment was made to Fundable.com.  Fundable.com is a website where

companies solicit funding from investors.  EMRx has a profile on Fundable.com which indicates

that it is seeking investors and funding.  In response to a subpoena, the Operations Manager at

Fundable.com advised that Martin also posted an ad on their sister site, Startups.com. The ad on

Fundable.com reads:

> Our Healthcare Technology Corporation is seeking $5m in Funding – I'd like to
> invite you to invest in a healthcare IT company with significant growth and
> earnings potential.  The U.S. electronic medical records (EMR) market is
> expected to grow to $6 billion by 2015 - driven by a federal mandate for all
> healthcare providers to adopt EMRs or be penalized.  However, only 1 in 6

Medicaid/Medicare providers have adopted an EMR system. EMRX Healthcare Technologies Corporation has the answer... EMRX would prefer to receive funding from these types of sources: -Equity funding (Venture Capital, Angel, Private Equity, etc.) At this point in time, we fully intend to use the funds that we raise for the following purposes: -Operating/Growth Capital (Payroll, Sales & Marketing, etc).

26.     EMRx has a website that appears to have become operational in or about May 2013. For example, the website includes two posts – "EMRx introduces a New Cloud-Based EMR/EHR" and "The Benefits of a Cloud-Based EMR" – that are respectively dated May 30th and May 31, 2013. Although the website itself, the date of its corporate registration and the date when its bank account was opened all indicate that EMRx became active only in or about May 2013, its website suggests that the company was a functioning and successful going concern, with statements such as "Our EMRx trainers understand your workflows because they have been licensed doctors themselves" or describing EMRx as "a leading provider of innovative health information management solutions that transform the administrative & clinical operations of 21st century health care organizations and medical practices."

27.     Your Affiant has conducted a telephone interview of Teresa Fuller, M.D., who is listed on EMRx's website as a member of the firm's "team." She stated that she worked for EMRx from July 2013 through November 2013 after Martin asked her to be the company's Chief Executive Officer. Fuller stated that this was not a full-time job and it was more of a consulting-type role. She said that she had only three or four meetings with Martin about EMRx, all of which took place in an office on K Street in Washington (presumably the 1717 K Street facilities rented out by Carr). Fuller said that while Martin represented to her that EMRx had been established for two years and had recently finished developing the software the company intended to market, nothing was actually sold by EMRx during the time she worked there. She said the company was financially disorganized, and that Martin ultimately told her that the

13

company's product was so unsatisfactory that the project had been tabled. She resigned from

EMRx on November 8, 2013. Thus, it appears that Martin in recent months has been continuing

his efforts to raise funds for a new business that he represented as a going concern, but that in

fact had no successful track record.

## MARTIN'S FALSE STATEMENTS AND MATERIAL NON-DISCLOSURES TO THE UNITED STATES PROBATION OFFICE AND OTHER VIOLATIONS OF HIS CONDITIONS OF SUPERVISED RELEASE

28.     In June of this year, the FBI received information from USPO Bill Tavik

reporting that he had developed information indicating that Martin was operating businesses that

he had not disclosed to the U.S. Probation Office and was possibly defrauding investors and

others in connection with the operation of these businesses. In late October 2013, USPO Tavik

submitted a Petition for Violation of Supervised Release with U.S. District Court Judge Ellen L.

Hollander in which he further reported that, among other conduct in violation of his terms of

supervised release, Martin had obtained a number of unauthorized lines of credit and had also

failed to disclose lawsuits that had been brought against him for failing to pay an employee, for

breach of contract with a leasing company, for failing to make payments on equipment leased to

him, and for sexual harassment. USPO Tavik's report and its attachments also documented that

Martin had made fraudulent representations in obtaining the lease on the Lexus in June 2011, as

set forth above. USPO Tavik's Violation Petition is attached to this Affidavit as **Exhibit 1**.

29.     USPO Tavik's report indicates that Martin made repeated false statements and

material non-disclosures to Mr. Tavik and other United States probation officers throughout the

entire three-year time period that he was on supervised release. Among these were the

following:

14

- During his residence at VOA and afterward, Martin reported to the Probation Office that he was working at NetCare Data Management as its sales manager, and that he was supervised by someone named Steven Sherk. In a financial affidavit Martin filed at the request of USPO Tavik in April 2013, Martin represented that he was still working for NetCare Data Management as its sales manager, and that this was his sole source of income. In fact, NetCare is part of the name of several companies that Martin incorporated in Maryland and the District of Columbia, but none of these appear to be commercially active. The principal focus of Martin's business activities from the fall of 2010 through mid-2012 instead appears to have been Oledix Technologies, but he never notified the Probation Office about the existence of this firm; about the fact that he was its part owner; that he had borrowed almost $480,000 from Ms. Lear to help establish Oledix and the Oledix Store; that he ran up $288,000 in unpaid charges on two company credit cards; or that he had also obtained credit from two firms, Financial Pacific Leasing ($51,272.35) and Fidelity Capital Partners, LLC ($26,358.29) to lease computer equipment.

- Martin never advised his probation officers that he had moved in with and lived with Ms. Lear from approximately January 2011 through November 2012, instead continuing to represent that he lived at an address in Frederick.

- Martin never disclosed to his Probation officers that he had been sued by Financial Pacific, NCF, and two former employees of Oledix.

15

## MARTIN'S ARREST AND THE SUBSEQUENT INVENTORY SEARCH OF HIS LEASED LEXUS

30.     After reviewing the Notice of Violation of Supervised Release submitted by

USPO Tavik in late October 2013, U.S. District Court Judge Ellen L. Hollander approved his

request that a warrant be issued for Martin's arrest.  On December 3, 2013, after obtaining

information concerning Martin's whereabouts, deputies from the U.S. Marshals Service (USMS)

attempted to arrest Martin at 1524 Burnwood Road in Baltimore City.  That morning, members

of the Fugitive Squad established surveillance on the front of this residence and on both ends of

the alley to the rear.  At approximately 8:40 a.m., the Squad members observed Martin leave the

residence and enter the driver's side of the leased black 2011 Lexus (Maryland license plate

7AE5297, VIN number JTHCE1KS9B0029209) previously mentioned in this affidavit.  Two

USMS covert vehicles entered the alley and approached Martin's vehicle from the rear.  Squad

members Eric Runk and Nayim Sadik, both of whom were prominently wearing placards that

identified them as "Police" and "US Marshals," got out of their vehicles and approached Martin,

ordering him to put his hands up.  Martin responded by putting his Lexus in reverse, forcing

Squad member Sadik to jump out of the way.  Squad member Runk reported that Martin struck

the car he had driven to the scene, then put his Lexus into drive and drove forward down the

alley away from the two officers, striking a plastic recycling bin as he did so.  Two other officers

entered the other end of the alley in another vehicle and blocked Martin's escape, and then

Deputy Runk approached and pinned Martin's car from the rear with his vehicle.  At that point,

Martin surrendered and was taken into custody.  A black Samsung smart phone in a black case

was recovered from one of Martin's pants pockets during a search incident to his arrest, and has

been secured, along with other items recovered from his person, in Deputy Marshal Runk's desk

at an offsite location.

31.     Since Martin's Lexus automobile was utilized in an attempt to flee the scene of an arrest and caused property damage to a USMS vehicle and Martin's vehicle, and because Martin's vehicle was obtained initially through false statements on the Lexus lease application and there was no reason to believe that Martin has legitimate employment from which to make the ongoing lease payments on his Lexus, the FBI took custody of and secured the vehicle.

32.     Martin's Lexus was transported to the FBI offices on Lord Baltimore Drive in Baltimore County, where an inventory of the car's contents was conducted by your Affiant and another agent.  During the course of the inventory procedure, in addition to the identification of the two apparent laptop or tablet computers, the SanDisk thumb drive, and the cell phone identified in paragraph 2 above, 12 credit or debit cards were found in the names of the following individuals or companies: Martin, Oledix, the Oledix Store, Oledix Development Partners Limited Partnership, REO Maintenance (another company incorporated by Martin) and EMRx. Checkbooks for REO Maintenance and EMRx were also found during the inventory, as were notebooks or planners and miscellaneous handwritten notes.  Based upon my training and experience in investigating white collar crime, the notebooks and planners and notes likely contain information pertaining to Martin's companies, activities, and other involved parties.  A substantial quantity of assorted mail items and documents related to lawsuits against Martin and his companies as well as an operating agreement and documents relating to communications from the Internal Revenue Service were also found during the inventory.

## SUMMARY OF PROBABLE CAUSE

33.     Based upon the evidence set forth above, there is probable cause to believe that Martin has committed mail and/or wire and bank fraud by submitting false credit applications to Lexus Financial Services; to American Express; to Bank of America; and to the other companies

17

from which he obtained the credit cards that were identified in his car during the inventory search. The evidence (in the form of bank account records, witness interviews, and allegations in lawsuits) indicates that neither Oledix nor EMRx were legitimate businesses with income resulting from *bona fide* commercial transactions, as opposed to funds received as a result of fraudulent representations and the incurring of hundreds of thousands of dollars in unpaid charges on company credit cards. Martin misrepresented his business activities to all of the U.S. probation officers who supervised his case and never identified any legitimate employment that has subsequently been verified for the entire period of more than three years since he started work release while still residing at VOA.

34.     Based on my training and experience in investigating white collar crime, individuals who own or operate small and/or newly established businesses utilize and rely heavily on computers and electronic media, such as smart phones and thumb drives, to exchange e-mails, advertise their companies on-line, access social media sites, create and store business-related documents and financials, and communicate with employees, vendors, and potential or established clients. Shortly after his release from incarceration, Martin started a business, Oledix Technologies, which allegedly sold computers. Martin operated Oledix Technologies until at least the summer of 2012, and also incorporated a number of other businesses using variations of the name NetCare since his release from VOA. More recently, after Oledix's apparent failure or cessation of operations, Martin established a new company called EMRx; arranged to have a website developed for it; and placed a purported business profile on two websites geared towards soliciting investors, indicating that EMRx was interested in raising millions of dollars in capital. The website and the funding notice both falsely suggested that EMRx was a successful going concern. EMRx's bank account received $136,542 from incoming wire transfers between June

2013 and August 2013, the source of which is not clear, but which, based upon the statements of

Dr. Fuller, did not come from legitimate commercial sales transactions.

35.     It further appears that since the summer of 2012, Martin has not rented permanent

office space for the companies he created, but has instead used the services in both Baltimore

and Washington of companies that provide short-term rentals of office space for any business

meetings he has needed to have.  It also appears that EMRx had few, if any, full-time employees

during the period after the company was created.

36.     Based upon my training and experience, and given his apparent lack of an

established, exclusively-used office space over the past several months and his short-term renting

of office space on an as-needed from companies where it does not appear that he is able to

permanently maintain files or records, there was probable cause to believe that Martin was

conducting the continued affairs of the various businesses he had established by using a laptop

and/or tablet computer or computers, possibly along with digital storage devices such as thumb

drives, and that he was also be relying upon one or more cell phones or smart phones to make

business-related telephone calls and to send e-mails and text messages related to his various

businesses.  The identification of the items specified above during the inventory that was taken

of the contents of Martin's Lexus following his arrest suggests that Martin kept computers and

business-related papers in his vehicle so that they would be readily available to him in the

conduct of the various companies he created, and also used the cell phones identified during the

car inventory and recovered from his person in connection with his activities in relation to the

companies he had incorporated.

37.     Based on my training and experience, there is probable cause to believe that

Martin made use of portable computers, such as laptops or tablets, as well as thumb drives, to

19

store documents and communications relating to his ongoing fraudulent schemes. There is also probable cause to believe that Martin carried or transported his laptops or tablets with him when he traveled to the various short-term rental business spaces he utilized or when going to meet with clients or potential investors at other locations. There is further probable cause to believe that Martin received his companies' mail at the various short-term office addresses he employed and then afterwards transported the mail, along with other business-related documents, with him between these locations and wherever he was residing.

38.     The items noted during the course of conducting the inventory of the contents of Martin's vehicle provide additional support for the belief that Martin was employing notebook, laptop or tablet computers in conducting his various schemes, including Oledix and EMRx and the various NetCare companies, and also indicate that Martin wound up transporting papers relating to his various business activities in his car. Based on my training and experience, there is probable cause to believe that the notebooks, laptops or tablets identified during the inventory procedure, along with the SanDisk thumb drive and the smart phone and the planners, documents, mail items, and credit cards identified during the inventory process, as well as the smart phone recovered by the USMS from Martin's person, likely contain information about Martin's various companies; his recent and past business and investment solicitation activities; and other individuals who are involved with him, whether as confederates, associates, actual or potential investors, or customers.

## SEARCHING AND SEIZING COMPUTERS

39.     Searches and seizures of evidence from computers commonly require agents to download or copy information from the computers and their components, or seize most or all computer items (computer hardware, computer software, and computer related documentation) to

20

be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

a.      Computer storage devices (like internal or external hard disk drives, compact discs (CD), digital video disc (DVD), flash drives, and others) can store the equivalent of millions of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it in random order with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

b.      Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a computer system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

40.      In searching any digital storage media, we will, to the extent possible, use computers and forensic software to conduct the searches. The search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may

21

include the following techniques (the following is a non-exclusive list, as other search procedures may be used):

a.  examination of all of the data contained in such computer hardware, computer software, and/or memory storage devices to view the data and determine whether that data falls within the items to be seized as set forth herein;

b.  searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

c.  physical examination of the storage device, including surveying various file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth in Attachment B;

d.  opening or reading portions of files in order to determine whether their contents fall within the items to be seized as set forth in Attachment B;

e.  scanning storage areas to discover data falling within the list of items to be seized as set forth herein, to possibly recover any such deleted data, and to search for and recover files falling within the list of items to be seized;

f.  performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in Attachment B; and/or

22

g.  performing any other data analysis technique that may be necessary to locate and

retrieve the evidence described in the relevant Attachments.

## CONCLUSION

Based upon the foregoing facts and my training and experience, your Affiant respectfully

submits that there is probable cause to believe that the items listed in Attachment B will be found

in Martin's Lexus automobile and on the notebook, laptop or tablet computer(s), phones and

thumb drive belonging to Martin, which were found inside Martin's vehicle during the inventory

procedure or on Martin's person at the time of his arrest, and which will constitute evidence of

criminal activity, specifically mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), bank

fraud (18 U.S.C. § 1344), money laundering (18 U.S.C. § 1956), and related offenses.


Tammy D. Ray
Special Agent
Federal Bureau of Investigation


Subscribed and sworn to before me this ___ day of December 2013.


The Honorable Susan K. Gauvey
United States Magistrate Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

IN THE MATTER OF THE SEARCH OF:          )          CASE NO. 13 -3027 SKG
A black Lexus automobile, MD license plate # 7AE5297,   )
VIN # JTCHCE1KS9B0029209, items found therein,     )
and a cell phone seized from Martin's person by the USMS )

**MOTION TO SEAL**

The United States of America, by its attorneys, Rod J. Rosenstein, United States Attorney

for the District of Maryland, and Jefferson M. Gray, Assistant United States Attorney for that

District, moves this Honorable Court for an Order Sealing the Application, Affidavit, and all

related documents in the above-captioned matter.

The government believes that if a certain uncharged individual mentioned in these

materials becomes more fully aware of the scope of the investigation, this individual may

attempt to encourage others to remove or destroy information that may be material to the

government's investigation.  The search warrant affidavit also reveals details of the

government's grand jury investigation that have not yet been publicly disclosed, including the

identity of persons co-operating with the investigation, which the government submits it is

inappropriate to reveal at this time.  The government also has some reason to believe that the

uncharged individual may have one or more confederates who assisted him in his activities who

might possibly flee, destroy evidence, or possibly try to intimidate witnesses if they became

aware of the matters discussed in the affidavit.  The affidavit also references other individuals

whose status – whether as co-conspirators or victims – remains unclear at this stage of the

investigation, and who might perhaps be inappropriately and unfairly embarrassed if the

Affidavit were disclosed at this time, long before there is likely to be final action with respect to

the government's investigation.  The government therefore respectfully requests that all documents filed in this matter be sealed until the investigation has been concluded.

WHEREFORE, the government requests that this Motion, Order, and all other documents filed in this action be **sealed** until further Order of this Court, and that one copy of the signed Order be provided by the Clerk to the United States Attorney's Office.

Respectfully Submitted,

ROD J. ROSENSTEIN
UNITED STATES ATTORNEY

By: _____
Jefferson M. Gray
Assistant United States Attorney

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

IN THE MATTER OF THE SEARCH OF:          )          CASE NO. 13 -3027 SKG
A black Lexus automobile, MD license plate # 7AE5297,   )
VIN # JTCHCE1KS9B0029209, items found therein,          )
and a cell phone seized from Martin's person by the USMS )

## ORDER GRANTING MOTION TO SEAL

The United States of America has filed a motion to seal the Application, Affidavit,

and all related documents in the above-captioned matter, proffering facts that it claims

demonstrate that if the Application, Affidavit, and related search warrant materials were

revealed, there is a risk that evidence may be destroyed and that individuals who may

ultimately become targets of the investigation might flee, and that other individuals

whose status with regard to the investigation is presently unclear might be subject to

unwarranted personal embarrassment or damage to their reputations. Based upon the

representations made in the government's motion and the Court's awareness of the facts

of this matter as demonstrated in the recent detention proceedings, the Court hereby

finds that these concerns have been sufficiently demonstrated to be well-founded to

warrant sealing the Application, Affidavit, and related documents until the investigation

is concluded. Accordingly, it is ORDERED that the Application, Affidavit, and all

related documents in the above-captioned matter shall be sealed until the investigation

is concluded.

SO ORDERED this ____ day of December, 2013.

_____
The Hon. Susan K. Gauvey
United States Magistrate Judge

2

FD-597 (Rev 8-11-94)

Page _____ of _____ 1

**UNITED STATES DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF INVESTIGATION**
Receipt for Property Received/Returned/Released/Seized

File # 318A-BA 2675919

On (date) 12/26/13

item(s) listed below were:
☐ Received From
☐ Returned To
☐ Released To
☑ Seized

(Name) Black Lexus MD  7AE5297

(Street Address) VIN # JTHCE1KS9B0024269

(City) _____

Description of Item(s): 1) Hanvon Touchpad w/charger
2) Black ipad in black case
3) Iphone in black case
4) Sandisk 16GB thumb drive
5) Business cards
6) Planners, notebook, documents
7) Documents and mail
8) Sandisk 8GB thumb drive
9) Documents, mail and tax return

Exhibit 2

Received By: SA _____
(Signature)

Received From: No one present
(Signature)

3

Case 1:14-mj-01285-SKG   Document 3   Filed 06/12/14   Page 47 of 50
Case 1:11-cr-00312-RDB   Document 33   Filed 03/19/14   Page 1 of 4
Judgment in a Criminal Case for Revocations with Supervised Release (Rev. 11/2011)                                      Judgment Page 1 of 4

# United States District Court

## District of Maryland

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2014 MAR 19 P 4: 10

CLERK'S OFFICE
AT BALTIMORE

BY_____ DEPUTY

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| | (For Revocation with Supervised Release) |
| v. | (For Offenses Committed On or After November 1, 1987) |
| CURTIS MARTIN | Case Number: RDB-1-11-CR-00312-001 |
| | USM Number: N/A |
| | Defendant's Attorney: Stuart Simms, Esq. (CJA) |
| | Assistant U.S. Attorney: Jefferson Gray, Esq. |

**THE DEFENDANT:**

☐ admitted guilt to violation of conditions(s) _____ of the term of supervision.

☒ was found in violation of condition(s) 1,2,3,4,5,6,7,8,9  after denial of guilt.

| Violation Number | Nature of Violation | Date Violation Occurred |
|---|---|---|
| 1 | Failed to answer inquires of probation officer | April 23, 2013 |
| 2 | Failed to report any change or addition of employment | --- |
| 3 | Falsely represent credit information | June 3, 2011 |
| 4 | False, fictitious and fraudulent statement in monthly supervision reports | --- |
| 5 | False, fictitious and fraudulent statements in financial statement of debtor | --- |
| 6 | False, fictitious and fraudulent statement in financial statement of debtor | --- |
| 7 | Failed to provide list of all financial information | --- |
| 8 | Obtained additional lines of credit without the approval of probation officer | --- |
| 9 | Assault, resist, or impede: Fleeing the scene of arrest | December 3, 2013 |

The defendant is adjudged guilty of the violation(s) listed above and sentenced as provided in pages 2 through __4__ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984 as modified by U.S. v. Booker, 125 S. Ct. 738 (2005).

☒ Supervised release is revoked.

☐ The defendant has not violated condition(s) _____  and is discharged as to such violation(s) condition.

**IT IS FURTHER ORDERED** that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.

March 18, 2014
Date of Imposition of Judgment

_Richard D. Bennett_   March 18, 2014

Richard D. Bennett                Date
United States District Judge

Name of Court Reporter: Gail Simpkins

― Exhibit 3 ―

Judgment in a Criminal Case for Revocations with Supervised Release (Rev. 11/2011)                                                     Judgment Page 2 of 4

DEFENDANT: CURTIS MARTIN                                         CASE NUMBER: RDB-1-11-CR-00312-001

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of __18__ months with credit for time served in federal custody from December 3, 2013.

☐  The court makes the following recommendations to the Bureau of Prisons:

☒  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

   ☐ at _____ a.m./p.m. on _____.
   ☐ as notified by the United States Marshal.

☐  The defendant shall surrender, at his/her own expense, to the institution designated by the Bureau of Prisons at the date and time specified in a written notice to be sent to the defendant by the United States Marshal. If the defendant does not receive such a written notice, defendant shall surrender to the United States Marshal:

   ☐ before 2 p.m. on _____.

**A defendant who fails to report either to the designated institution or to the United States Marshal as directed shall be subject to the penalties of Title 18 U.S.C. §3146. If convicted of an offense while on release, the defendant shall be subject to the penalties set forth in 18 U.S.C. §3147. For violation of a condition of release, the defendant shall be subject to the sanctions set forth in Title 18 U.S.C. §3148. Any bond or property posted may be forfeited and judgment entered against the defendant and the surety in the full amount of the bond.**

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____ at _____, with a certified copy of this judgment.

                                           _____
                                           UNITED STATES MARSHAL

                              By:          _____
                                           DEPUTY U.S. MARSHAL

Case 1:14-mj-01285-SKG   Document 3   Filed 06/12/14   Page 49 of 50
Case 1:11-cr-00312-RDB   Document 33   Filed 03/19/14   Page 3 of 4
Judgment in a Criminal Case for Revocations with Supervised Release (Rev. 11/2011)                                                                                    Judgment Page 3 of 4

DEFENDANT: CURTIS MARTIN                                              CASE NUMBER: RDB-1-11-CR-00312-001

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of __18 month__.

**The defendant shall comply with all of the following conditions:**

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

### A.   STATUTORY CONDITIONS OF SUPERVISED RELEASE

1) The defendant shall not commit any federal, state or local crime.
2) In any felony case, the defendant shall not possess a firearm or ammunition as defined in 18 U.S.C. §921.
3) The defendant shall not illegally use or possess a controlled substance.
4) The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as directed by the probation officer.
☒ The above drug testing condition is suspended based on the court's determination that the defendant poses a low risk of future substance abuse. (Check, if applicable.)
5) Pursuant to Pub. Law 108-405, Revised DNA Collection Requirements under the Justice for All Act of 2004, if applicable, the defendant shall cooperate in the collection of DNA while incarcerated in the Bureau of Prisons, or as directed by the probation officer.
6) If this judgment imposes any criminal monetary penalty, including special assessment, fine, or restitution, it shall be a condition of supervised release that the defendant pay any such monetary penalty that remains unpaid at the commencement of the term of supervised release in accordance with the Schedule of Payments set forth in the Criminal Monetary Penalties sheet of this judgment. The defendant shall notify the court of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay restitution, fines, or special assessments.

### B.   STANDARD CONDITIONS OF SUPERVISION

1) The defendant shall not leave the judicial district without the permission of the court or probation officer;
2) The defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer;
3) The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
4) The defendant shall support his or her dependents and meet other family responsibilities;
5) The defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons;
6) The defendant shall notify the probation officer ten days prior to any change in residence or employment;
7) The defendant shall refrain from excessive use of alcohol;
8) The defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9) The defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any persons convicted of a felony unless granted permission to do so by the probation officer;
10) The defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;
11) The defendant shall notify the probation officer within 72 hours of being arrested or questioned by a law enforcement officer;
12) The defendant shall notify the probation officer within 72 hours of being charged with any offense, including a traffic offense;
13) The defendant shall not enter into any agreement to act as an informer or special agent of a law enforcement agency without the permission of the court;
14) As directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

Judgment in a Criminal Case for Revocations with Supervised Release (Rev. 11/2011)                                    Judgment Page 4 of 4

DEFENDANT: CURTIS MARTIN                                        CASE NUMBER: RDB-1-11-CR-00312-001

# C.   SUPERVISED RELEASE
## ADDITIONAL CONDITIONS

1. The defendant shall provide the probation officer with access to any requested financial information.

2. The defendant shall not incur new credit charges or open additional lines of credit without approval of the probation officer.